FILED

10/10/2022

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

April 20, 2022 Session Heard at the University of Tennessee at Martin[1]

**STATE OF TENNESSEE v. BRADI  BAKER**

**Appeal from the Circuit Court for Madison County**
**No. 19-719    Donald H. Allen, Judge**

_____

**No. W2021-00085-CCA-R3-CD**

_____

The Defendant-Appellant, Bradi Baker, was found guilty of second degree murder by a Madison County circuit court jury based on the shooting death of her ex-husband.  See Tenn. Code Ann. § 39-13-210(a)(1). The trial court sentenced the Defendant as a Range I, standard offender to twenty-five years in the Department of Correction.  On appeal, the Defendant asserts that: 1) the trial court abused its discretion in admitting Exhibits 4B and 4C, two cell phone videos taken from the victim's phone depicting his shooting death;[2] 2) the trial court abused its discretion in admitting Exhibit 4D, a "video compilation of other exhibits manipulated and edited by law enforcement"; 3) the trial court committed plain error by admitting Exhibit 4D in violation of the Defendant's due process rights; 4) the evidence was insufficient to sustain the Defendant's conviction for second degree murder; and 5) the trial court erred in sentencing the Defendant to twenty-five years imprisonment. After careful review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which J. ROSS DYER, J., joined, and JOHN EVERETT WILLIAMS, P.J., (not participating).[3]

Brian D. Wilson, Assistant Public Defender, Tennessee District Public Defenders Conference, Franklin, Tennessee (on appeal); Greg Gookin and Mitchell Raines, Jackson, Tennessee (at trial), for the Appellant, Bradi Baker.

_____

[1] Oral argument for this case was heard on the campus of the University of Tennessee at Martin.
[2] Given that Exhibit 4D is comprised of Exhibits 4A, 4B, and 4C, we have reordered the Defendant's issues for clarity and ease of analysis.
[3] The Honorable John Everett Williams passed away on September 2, 2022, and did not participate in this opinion.  We acknowledge his faithful service to this Court.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Jody S. Pickens, District Attorney General; and Joshua Dougan, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

The instant case stems from the April 8, 2019 murder of Geoffrey Brunkhorst, the victim and the Defendant's ex-husband. The murder occurred following a physical confrontation between the Defendant and the victim in the driveway of a home they previously owned together after the Defendant accused the victim of stealing her mail. The Defendant retrieved a handgun from her SUV and fired multiple shots at the victim, killing him. The Madison County Grand Jury indicted the Defendant for first degree premeditated murder on August 26, 2019. The trial court entered an order "Directing Forensic Evaluation by Pathways" of the Defendant on April 18, 2019.[4]

**Trial.** At the July 15-16, 2020 trial, Ben Curlin testified that he was at his "shop" at the "old Wilson Boat Shop" on April 8, 2019, when he observed a black SUV turn around in his shop's parking lot and begin driving "very fast" towards Hollywood Drive, making the "fastest exit [he'd] ever seen anybody [make in] that parking lot[.]" Curlin "heard some real loud yelling" and observed the black SUV parked in a driveway on Hollywood Drive and two individuals who were "nose-to-nose." Curlin called 911 and informed the operator that he was witnessing a domestic dispute, and he remained on the line and relayed what was happening as the dispute escalated. At some point, the victim "put [the Defendant] into a bear hug[,]" and the Defendant subsequently got back into her SUV and "tried to run [the victim] down." Curlin heard "body blows" when the confrontation first began, but he "didn't see [the Defendant] hit [the victim.]" As Curlin began walking toward the confrontation, a woman named "Janet" pulled up, exited her car, and "got in between them[.]" As Curlin continued his approach, "Janet disappeared." The Defendant was standing in front of the victim at that point, and "that's when the gunfire started." Curlin saw the Defendant shoot the victim an estimated three times. He believed that the Defendant was "doing most of the yelling" prior to the shooting. He denied seeing the victim "do anything that . . . would have provoked this reaction" from the Defendant. Curlin identified photographs of the crime scene and the Defendant's and the victim's vehicles. He also identified a recording of his 911 call, which was played for the jury. He agreed that his voice was on the recording and that he accurately relayed what he observed on April 8, 2019. The 911 call was admitted into evidence as Exhibit 4A.

On cross-examination, Curlin testified that the confrontation occurred approximately 200 feet away from his shop. He agreed that he was wearing his glasses

---

[4] There is no other mention of the Defendant's forensic evaluation in the record on appeal.

when he observed the altercation.  Curlin testified that he was close enough to see that the altercation was between a "black female and a white man[.]"  However, the only one he heard yelling was the Defendant.  He stayed on the phone with the 911 operator until the police arrived.  Curlin agreed that the shooting unfolded within "a few minutes" and that he gave a statement to police "[w]ithin hours" of the shooting.  Curlin testified that the victim did not move when the Defendant drove her SUV towards him and said he "didn't know how . . . she missed him[.]"  Curlin elaborated that he was not sure what actually caused the "loud thud[s]" that he previously described as "body blows."  He agreed that he never saw either party hit the other.  Curlin stated that the victim had the Defendant in the "bear hug" for "a matter of seconds."  He could not recall whether Janet was present when the "bear hug" occurred.  He was unsure whether the victim was "larger" than the Defendant.  Curlin testified that the Defendant did not attempt to flee the crime scene after shooting the victim.

On redirect examination, Curlin testified that he described the "bear hug" as "good" in the 911 call recording because he believed the victim "knew the cavalry was coming because he could see [Curlin] on the telephone."  The victim faced Curlin throughout the entirety of the altercation.  Curlin denied that there was anything preventing the Defendant from driving away from the altercation prior to the shooting.

On recross-examination, Curlin testified that he was approximately 75 to 100 feet away from the Defendant and the victim when the "bear hug" occurred.  He remembered that the victim approached the Defendant and placed her in the "bear hug" after she drove her SUV towards the victim.

Janet Barnes testified that she first met the Defendant in 2016 when Barnes moved into a house on Hollywood Drive and introduced herself to the Defendant.  She described their relationship as "acquaintances getting to know each other as neighbors."  On April 8, 2019, the Defendant called Barnes and asked if she could use Barnes' driveway to "walk in the backyard[] to check and see what was going on at her house."  She elaborated that she had a missed call from the Defendant at 2:32 p.m., and she called the Defendant back at 2:35 p.m.  Barnes testified that the Defendant previously told her that she had to move out of her house by "the first of April[,]" and Barnes "had not seen a vehicle there for a couple of weeks[.]"  Barnes told the Defendant she could use her driveway, and she heard the Defendant arrive and later saw her SUV in the driveway but was at first unable to locate the Defendant.  She then saw through her window the Defendant go down her driveway "a little faster than what normally you would go down a driveway."  At 2:56 p.m., Barnes told

her husband that something "[didn't] feel right" and drove to "their big house residence"[5] but did not see any cars or anyone there.

As Barnes was driving back towards her home, she observed the victim's vehicle and the Defendant's vehicle, which was "angled towards" the victim's, at the "little house" the Defendant and the victim also owned on Hollywood Drive. Barnes pulled into the driveway and saw the Defendant pulling on a bag that the victim was wearing across his chest. The Defendant punched the victim's head approximately eight times, and the victim subsequently punched the Defendant approximately four times in what Barnes thought was her head, though she could not see the Defendant. Barnes got out of her vehicle and slammed the door, causing the victim to turn around. Barnes told the victim and the Defendant that she did not want them to fight, and the victim responded that he also did not want to fight. The Defendant then walked back to her SUV. Barnes testified that the victim did not look "mad" or "like he wanted to fight" but instead seemed "frustrated" and was fighting in "response" to the Defendant.

Barnes did not think that the victim was the aggressor in the altercation. Barnes did not see the victim do anything to aggravate the Defendant, other than striking her with four blows in response to the blows the Defendant delivered to him. The victim and the Defendant did not say anything to each other after the victim struck the Defendant. When the Defendant walked back to her SUV, the victim took the bag he was wearing to his vehicle and placed it in the back-passenger seat. Business cards and other papers had fallen out of the bag onto the ground, and Barnes helped the victim collect them. The victim told Barnes that the papers belonged to him, and she handed them to him. Barnes walked over to the Defendant's SUV, where the Defendant was "holding the driver's side passenger door with her left hand, and she was doing something in the seat with her right hand[.]"

Barnes told the Defendant that she needed to calm down, to which the Defendant replied, "I am calm." Barnes responded, "Okay. Please, Ms. Bradi, come on." The Defendant then told Barnes, "Get out of here, Janet. Go home. Get out of here." Barnes then went towards the victim to hand him more of the papers that he dropped, and the Defendant changed positions. The Defendant yelled at Barnes "to get out [of] there, to go home, that [she] wasn't there for [the Defendant] when [the victim] left." Barnes responded that she stayed "half a day" with the Defendant when the victim left, and the Defendant walked away from Barnes. When Barnes turned, she saw the Defendant with raised arms pointing a gun towards the victim. The victim held his hands up and "said wait or whoa, and then it was pop, pop, pop." Barnes went towards her vehicle and then heard another

---

[5] The record indicates that the Defendant and the victim owned two residences on Hollywood Drive during their marriage. They apparently resided in the "big" Hollywood Drive house and operated it as a bed and breakfast. The shooting occurred at the "little" Hollywood Drive house.

"pop, pop[.]" Barnes pulled out of the driveway and "didn't even get to the . . . next house" before Curlin approached her and informed her that he was on the phone with 911 and had "witnessed everything." She noticed a police car approaching, so she informed the officer that "Ms. Bradi just shot her husband[.]" Barnes saw the Defendant "still standing in the drive" as police arrived. Barnes clarified that when she heard the gunfire, the victim was standing by the "passenger door/wheel area" with "three shots . . . in his chest area." Barnes identified photographs of the victim and the crime scene.

On cross-examination, Barnes testified that she lived three houses down from the house that the Defendant and the victim shared. She reiterated that the Defendant pulled out of her driveway quickly and "took a sharp turn into the ditch" in front of her home. Barnes clarified that when she arrived at the altercation, she parked her vehicle in between the Defendant's vehicle and the victim's vehicle. She denied seeing the victim's phone in his hand. The Defendant and the victim were approximately four or five feet away from each other when Barnes arrived at the altercation. Barnes saw the Defendant slap the hood of the victim's car. Barnes clarified that the Defendant and the victim were in a "tug-of-war" with the strap of his bag, which she described in her written statement to police as "a black bag" that the Defendant was trying to take from the victim. She testified that she only saw the Defendant go to her driver-side passenger door and did not see her driving the SUV. Barnes was unsure whether the Defendant was still holding the gun when she observed her after the shooting.

Jackson Police Department ("JPD") Investigator Robert Groves testified that he was assigned to investigate the shooting. At the scene, Investigator Groves noticed an iPhone that "had the camera screen still visible on the phone[,]" which was secured and later analyzed. He also processed part of the scene and collected a "firearm that was located near one of the vehicles." Investigator Groves identified photographs of the crime scene, including a photograph depicting him clearing the semiautomatic firearm found at the scene. He testified that he removed a magazine from the firearm and a live round from the chamber, and he elaborated that the live round in the chamber rendered the firearm "ready to fire . . . if someone had pulled the trigger on it." Investigator Groves testified that the firearm appeared to be functioning properly, and there was nothing that would have prevented it from continuing to fire when the trigger was pulled. He stated that the victim's body was located next to his sedan, the Defendant's SUV was parked partially in the yard, and the firearm was found in the middle of the two vehicles.

Investigator Groves testified that the victim's iPhone was locked, and when his fingerprint was unable to unlock it, Investigator Groves used a "forensic tool" that was able to pull a "zip file" of information from the phone. He then used the Cellebrite program to produce a "forensic recreation" of the phone on his computer. There were "several pieces of authentication" used to establish that the phone belonged to the victim, including

- 5 -

verification of his phone number with a relative and an "individual mobile equipment identifier" number. Investigator Groves located two videos on the iPhone, one of which lasted 35 seconds and was taken just prior to the shooting, and one of which lasted almost seven minutes and was taken prior to, during, and following the shooting. He identified the beginning still frame from the videos, and both videos were played for the jury over the Defendant's objection. The two iPhone videos were admitted into evidence as Exhibits 4B and 4C, respectively. Investigator Groves also identified the magazine and firearm found at the scene, which he described as a Century Arms TP 9 nine-millimeter pistol. He explained that although the magazine could hold 15 rounds, the firearm could hold 16 rounds total because one round would be stored in the chamber. Investigator Groves testified that he created an overlay of the "real time" audio from Curlin's 911 call onto the two videos recovered from the victim's iPhone, which was admitted into evidence as Exhibit 4D over the Defendant's objection. He explained that he created the overlay because it "show[ed] the progression of time between the two videos, matching up key events on the audio versus the video." There was only "an 85-second gap between the end of one video and then the next video[,]" and the video footage combined with the 911 audio demonstrated such. Exhibit 4D was played for the jury during the State's rebuttal closing argument.

On cross-examination, Investigator Groves agreed that the duration of the whole incident, beginning before the first video began and lasting until the actual shooting, was between three and three and a half minutes.

JPD Investigator Kevin Mooney, who processed the crime scene, identified the crime scene diagram he made and the crime scene photographs he had taken. He identified three photographs showing the following items in the Defendant's SUV: an open box of nine-millimeter cartridges; a zippered bag containing 62 live rounds found in the "back left seat"; two pieces of mail addressed to the Defendant; and a black and yellow zippered bag containing a pistol case, cleaning pad, and two unopened packages of shooting targets. He also identified a photograph of a black messenger bag in the victim's vehicle.

On cross-examination, Investigator Mooney agreed that his report indicated that he swabbed a stain at the crime scene that he believed to be blood and that the victim's shirt suggested he was "sweating heavily" prior to the shooting.

JPD Investigator Ron Pugh described how the firearm found at the crime scene operated. He explained that the trigger had to be pulled each time the firearm was discharged, such that it was impossible that the Defendant could have pulled the trigger one time for all "four or five shots[.]" Investigator Pugh elaborated that "if you're going to shoot this [firearm] five times, you have to pull the trigger five times. . . . You can't just hold down the trigger and shoot more than once." He denied that there was any indication

the firearm was malfunctioning or that it could have gone off by itself because the manufacturer administered testing during the manufacturing process to ensure that it could not do so. He agreed that the firearm had a safety mechanism.

On cross-examination, Investigator Pugh agreed the Defendant was not at the crime scene when he arrived. He "did a check" on the Defendant to see if she could lawfully possess a firearm and did not find any Tennessee felony convictions in her record.

Dr. David Zimmerman, the pathologist who performed the victim's autopsy, testified that the victim was shot a total of five times. Dr. Zimmerman stated that he was unsure in what order the victim received the wounds and only numbered the wounds for the "convenience of documentation." The first gunshot wound was an "indeterminate range, perforating gunshot wound of the torso." Dr. Zimmerman explained that "perforating" meant the "bullet goes all the way through the body." He further explained that "indeterminate" meant the gunshot came from "pretty far away[,] or something was blocking the soot or gunpowder stippling." The first gunshot entered the victim's right chest, causing injury to the aorta, right lung, and muscle. It also caused bleeding around the wound and a fracture to one of the bones in the spinal column. The first gunshot exited from the victim's "right back." The second gunshot wound was also an indeterminate range, perforating wound. It entered through the right upper abdomen, causing injury to the liver, colon, and right kidney. The second bullet exited through "the right lower back." The third gunshot wound was also indeterminate range but did not exit the victim's body. It entered through his left upper abdomen and caused damage to the liver and muscle and fractured a rib and the sternum. Gunshot wound number four was an indeterminate range, perforating wound. The fourth bullet entered through the back of the victim's left upper arm and continued into his chest, damaging his lungs, aorta, and muscle and fracturing his ribs, exiting through the right upper back. The fifth and final gunshot wound was also an indeterminate range, perforating wound that entered through the back of the left upper arm, went through muscle, and exited through the medial left upper arm. Dr. Zimmerman testified that the victim's cause of death was multiple gunshot wounds, and his manner of death was homicide. The victim had amphetamine in his bloodstream at the time of his death, but Dr. Zimmerman was unsure of its origin. Dr. Zimmerman testified that any one of gunshot wounds one through four would have resulted in the victim's death.

On cross-examination, Dr. Zimmerman agreed that the victim was "about 6'1" [and] 240 or so pounds[.]" He elaborated that he ran a toxicology screen on the victim by collecting a blood sample during his autopsy and sending it to an external lab for analysis. Dr. Zimmerman testified that the victim likely had a 20-milligram dose of amphetamine to reach the levels found in his bloodstream, but he could not testify to what effect that dose would have had on the victim because every individual has a "different level of intoxication, depending on their level of tolerance for the drug." Possible side effects of

amphetamine could include hyperactivity and irritability. He reiterated that he was unsure of the source of the amphetamine and did not observe any injection marks on the victim's body. He did not observe any abrasions on the victim's hands or face that "indicated any kind of altercation[.]"

On redirect examination, Dr. Zimmerman agreed that the amount of amphetamine found in the victim's bloodstream could be within the "normal therapeutic range of the drug, depending on what the prescribed dosage was." He further agreed that a person abusing amphetamine would typically take a much higher dose of the drug than was found in the victim's bloodstream. On recross-examination, Dr. Zimmerman reiterated that he did not know the source of the amphetamine found in the victim's bloodstream and that the drug could potentially still cause side effects, even at therapeutic levels, depending on a person's tolerance. He did not know how long the victim had been taking amphetamine.

Following the close of the State's case in chief, the Defendant moved for a judgment of acquittal, asserting that the State had not presented sufficient proof of premeditation. The trial court denied the motion, finding that there was sufficient proof for a jury to find the Defendant guilty of first degree murder.

Nickkisha Phillips testified that she was the Defendant and the victim's next-door neighbor on Hollywood Drive. She met the Defendant when Phillips moved into the neighborhood in the summer of 2015. Phillips testified that she was "there the day [the victim] left" the Defendant, which she believed occurred in May 2018. The Defendant continued to live in the "big" house on Hollywood Drive after she and the victim separated and eventually divorced. The Defendant began moving out of big the house on Hollywood Drive at the end of February 2019. At some point, the Defendant was living in the house on Hollywood Drive without power. Prior to the shooting, Phillips and the Defendant spoke daily, "sometimes several times a day." The two would also eat lunch together on Phillips' lunch break because they were both home during the day. Phillips testified that after the Defendant and the victim's divorce in December 2018, the Defendant experienced a "demise of . . . her mental state and stability." Phillips elaborated that the Defendant became "really withdrawn" and "seemed depressed" when her divorce was finalized, and she made statements to Phillips that led her to believe the Defendant was having suicidal thoughts. Phillips asked a therapist what she could do to help the Defendant, and the therapist advised her to stay in contact with the Defendant, which was "why, at least two or three times a day, [Phillips and the Defendant] would chat, touch bases, do lunch." She agreed that the Defendant completely moved out of the big house on Hollywood Drive sometime during the end of March or first of April.

The Defendant visited Phillips' house between 2:15 and 2:30 p.m. on the day of the shooting. The Defendant remained in the house while Phillips went to pick her youngest

children up from school, which was approximately one mile from her house. As she was picking up her children, Phillips' friend called and told her that police were in front of her house and had blocked off the street. Phillips called her older daughter, who was at her home with the Defendant when Phillips left, to ask what had happened. Her daughter believed that a car accident had occurred near their home. A few minutes later, JPD Investigator Donald called Phillips at the Defendant's request. When Phillips arrived at her home, uniformed officers met her in the driveway. She saw the Defendant in the back of a police car, and she looked "blank" and "vacant[.]" Phillips later met officers downtown to give them an oral statement. Earlier in the day, Phillips was on the phone with the Defendant when she saw the victim's vehicle parked at the house on Hollywood Drive,[6] which she relayed to the Defendant.

On cross-examination, Phillips clarified that she called the Defendant on the day of the shooting around 1:00 p.m. The Defendant had to answer another call, so she hung up and called Phillips back, asking if they could eat lunch together. During the second phone call, Phillips told the Defendant she had already eaten but invited her to her home. She also relayed that she had seen the victim's vehicle parked in the driveway of the Hollywood Drive house. Phillips elaborated that the Defendant did not say anything "unusual or concerning" in response to learning that the victim was at the Hollywood Drive house. The Defendant did not mention the victim while she was at Phillips' house on the day of the shooting. Phillips testified that she would not have allowed the Defendant to be around her children if she believed she was "a threat to others or . . . violent or anything[.]"

Following the shooting, Phillips watched the video footage from her security system. In the footage, the Defendant left the home approximately two minutes after Phillips and walked towards Barnes' house, where she had parked her SUV. Phillips testified that during the approximately 30 minutes she spoke to the Defendant before leaving to pick up her children, the Defendant did not give any indication that she was "particularly depressed[.]" Phillips reiterated that prior to the shooting, the Defendant did not indicate that she desired to harm the victim, only herself. Phillips estimated that she last went inside the big Hollywood Drive house during the second week of March 2019. While there, she noticed writing either "spray painted or painted on" multiple walls of the house. Although the Defendant did not explicitly say she was responsible for the writings, she implied that she was. Phillips agreed that she would be "surprise[d]" to learn that the Defendant had written threatening messages to the victim on the walls of the big Hollywood Drive house.

---

[6] It is unclear from the record whether Phillips was referencing the big or little house on Hollywood Drive.

The Defendant elected to testify on her own behalf. She testified that she and the victim were married on October 10, 2010,[7] and he moved out of the big Hollywood Drive house on May 21, 2017. The victim filed for divorce on June 2, 2017. She continued living in the big Hollywood Drive house while the divorce was pending. The Defendant explained that the big house was actually a bed and breakfast that they purchased in 2013, and they "rented suites" in the house. The victim was an "internet security architect" and had more income than the Defendant. Following the divorce, the victim was "ordered to continue paying the bills" and had "absolute control of the finances." Their divorce agreement stipulated that the Defendant would move out of the big Hollywood Drive house by April 1, 2019, but the victim "disconnected the water and the electricity and all of the utilities in mid-March." She did not go inside the big Hollywood Drive house after she moved out on April 1. She would retrieve her mail from the big Hollywood Drive house mailbox whenever she visited Phillips, but her mail was often missing from the mailbox. While she was still living in the house, there "was mail delivered that [she] didn't receive." On April 8, 2019, the day of the shooting, the Defendant stopped at a gas station and visited a quilting store before going to Phillips' house. The Defendant stated that Phillips' mother first told her that the victim was at the big house on Hollywood Drive. After Phillips left to go pick up her children, the Defendant observed the victim leaving the big Hollywood Drive house and taking the Defendant's mail from the mailbox. The victim started walking "pretty fast" north on Hollywood Drive, so the Defendant got in her car, which was parked in Barnes' driveway. The Defendant testified that she was 5 foot 4 inches tall and, therefore, could not catch up to the victim on foot. She drove around to see if she could locate the victim and saw his vehicle at the other "little house" they owned on Hollywood Drive.

After locating the victim's vehicle, the Defendant pulled into the driveway, and the victim met her there. The Defendant told the victim that she wanted her mail, and he told her that he did not have any of her mail. She told him that she saw him take her mail out of the mailbox, and he responded that she was "crazy." At some point, the victim began filming their interaction on his phone. The Defendant kept repeating, "I want my mail," and she tried to pull the shoulder bag off the victim that contained her mail. The victim also pulled on the shoulder bag, and he put the Defendant "in a headlock and started punching [her] in the top of the head." She let go of the shoulder bag, and the victim released her from the headlock.

The Defendant testified that she remembered getting into her SUV and "leaving, backing out[,]" but she did not remember shooting the victim. She was "stunned" and "blacked out a bit." The Defendant explained that she found the firearm she used to shoot

---

[7] There is a discrepancy in the record as to whether the marriage occurred on October 10, 2010, or December 12, 2012.

- 10 -

the victim in one of the rooms at their bed and breakfast after a person checked out. She "didn't know quite what to do with it" and placed it in her SUV. The Defendant did not remember being placed into a police car after the shooting or seeing Phillips but remembered an officer asking her "who was on the ground." She remembered being at the police station and talking to two investigators. The Defendant stated that she was not a convicted felon or otherwise prohibited from possessing a firearm at the time of the shooting and did not plan to shoot the victim. She had "no idea" what she meant when she said "you wanted this" following the shooting, as heard on the recording. The Defendant denied lying in wait for the victim and stated that she felt the victim's shooting was "horrible." She explained that the writing on the wall in the big Hollywood Drive house was her "response to things that had been happening to [her]." The Defendant testified that she was taking prescription medication for "the depression and the stress" and was also self-medicating with prescription medication at the time of the shooting. She reiterated that she saw the victim take mail from the mailbox on the day of the shooting. She stated that she was "informed that [the victim] had come to the property after [she] would leave" following their divorce. She only had contact with the victim through their attorneys and email after the victim moved out of their home.

On cross-examination, the Defendant testified that she never thought about or planned to kill the victim. She reiterated that she did not remember shooting the victim but agreed that she had done so and had fired five bullets. She clarified that she stopped remembering the events of the shooting when she got into her SUV and "thought [she] drove away." She was able to remember an officer asking her "who the man on the ground was" when she was in the back of the police car. She agreed that she did not drive away but instead drove her SUV towards the victim and subsequently removed the firearm from a bag in her SUV, held the gun behind her back, told Barnes to leave when she tried to intervene, then shot and killed the victim. The Defendant testified that she would "not knowingly" shoot someone five times and that "[n]o one deserves to get shot." She reiterated that she did not remember Barnes being present during the shooting. She denied writing anything directed towards the victim on the walls of the big house on Hollywood Drive. She also denied previously telling the jury that the writings were a "response to something that happened[.]" The Defendant testified that she was taking Lorazepam, Zoloft, Buspar, and Xanax at the time of the shooting. She stated that Curlin and Barnes testified to the truth "from [their] perspective" and that she did not deny she shot the victim.

On redirect examination, the Defendant agreed that there were "things written on the wall . . . that had nothing to do" with the victim. She stated that she took Lorazepam for "voices" and agreed that the other medications were for depression and anxiety. The Defendant agreed that she initially approached the victim on the day of the shooting to retrieve the mail from him that he had taken from the mailbox.

Investigator Pugh was recalled by the State as a rebuttal witness. He testified that when he searched the big house on Hollywood Drive, there was "[l]ots of writing on the walls[.]" He remembered that one of the writings said, "The plantation has been returned to the whiteful owner. I didn't do what you said. I never threatened you." Another writing said, "[Y]ou stole my dreams because you had none of your own." He agreed that some of the writings could be construed as threats. Photographs of some of the writings were received as exhibits. One of the photographs showed a writing that said, "You will spend the rest of your life looking over your shoulder . . . wondering." Investigator Pugh said the writings appeared to be written with a permanent marker or magic marker. Another one of the writings said, "You leave bodies everywhere you've been." A separate writing said, "Down south, women have fathers and brothers with guns. You might get your wish!" He denied that he had any reason to believe that someone other than the Defendant wrote the messages. Investigator Pugh testified that the Defendant was transported to the JPD offices, where she spontaneously asked, "Is Geoff dead?" after he brought her a glass of water. The Defendant did not make a statement and wished to speak to her attorney. He did not want to speak to her before reading her, her Miranda rights and told her they would talk "in a bit."

On cross-examination, Investigator Pugh agreed that the writings on the walls were "odd" and clarified that some were written in marker and some with purple spray paint. There were several other writings on the walls in different rooms. He estimated that his conversation with the Defendant on the day of the shooting occurred between 4:00 and 4:30 p.m. Investigator Pugh agreed that it was "absolutely [the Defendant's] right" not to speak to him without an attorney. He testified that his interaction with the Defendant was "very, very limited[,]" and he was unaware that the Defendant was previously married to the victim when she asked if he was dead, though he knew they were in some sort of "domestic relationship[.]" He reiterated that there were "several" other writings on the walls in the big Hollywood Drive house and agreed that he did not see who wrote them.

The jury ultimately found the Defendant not guilty of first degree murder but did find her guilty of second degree murder, a lesser-included offense of first degree murder.

**Sentencing.** At the September 3, 2020 sentencing hearing, Sheila Brunkhorst[8] stated that she was the victim's sister. She stated that the victim was a "really good guy" who "helped everybody." Sheila read her victim impact statement to the court, describing how the victim was an "outstanding citizen" who "was not threatening [the Defendant] in any way[.]" She also stated that the Defendant had previously fired a gun towards the victim and had "put[] holes through the china hutch" while the victim was moving out of

---

[8] This section of the opinion contains testimony of the victim's family members, who share the same surname. We will refer to them by their first name and intend no disrespect in doing so.

their house. Sheila believed the Defendant parked her SUV in Barnes' driveway so that the victim would not see her and that the confrontation was "not about mail" because the Defendant previously told her she rented a post office box and gave her the address via email. She said that police told her there were "three uncashed alimony checks" and "additional letters" in the Defendant's SUV. The victim apparently planned to move back to Iowa to help care for their elderly father who had Parkinson's disease. She characterized the Defendant as someone who "terrorized[,]" controlled, and stalked the victim and their family and as wanting a "sugar daddy" to pay for everything. Sheila elaborated that their elderly mother told her she "had been scared for years that [the Defendant] would drive to Waverly, Iowa, and kill them[,]" causing her to "always check[] and double check[]" that her windows and doors were locked. She asked the trial court to ensure that the Defendant could not have "contact with any member of [her] family. No emails. No phone calls. No letters." Sheila also alleged that the Defendant lied to the trial court when she stated that she did not have anything of value to sell to pay for her defense.

On cross-examination, Sheila clarified that she knew the Defendant shot at the victim when he moved out in 2017 because she found bullet holes in the furniture when she cleaned out his storage unit and because the victim told her about the incident. She agreed that at the time of sentencing, there was an ongoing civil suit filed by her family against the Defendant.

Donna Brunkhorst Litman testified that she was the victim's sister. She read victim impact statements written by Caitlin Brunkhorst, the victim's daughter, and the victim's mother. Caitlin expressed her sadness that the victim was unable to walk her down the aisle when she got married or live to see her future children. She stated that she did not write a victim impact statement because she hated the Defendant but because she loved the victim and suffered "immense pain" because of his murder. She asked the court to ensure that the Defendant could "never hurt another innocent family or person again in this lifetime."

The victim's mother also wrote a victim impact statement, which Litman read to the court. Her letter described how the Defendant caused the victim to be alienated from his three children and forced the victim to "obey" her. At some point, the victim tried to get the Defendant "medical help" because she became "more demanding and more paranoid." His mother alleged in her statement that the victim knew the Defendant "had a gun" and that the Defendant previously asked him to vacate their property at gunpoint. She hoped that the Defendant never received parole because she "long lived in fear of" the Defendant. On cross-examination, Litman stated she last talked to the victim a week before the shooting. She agreed that the victim's children were adults.

The Defendant made a statement of allocution. She explained that it was "hard to believe" that "all of th[e] goodness" of her being "a dedicated and a loving wife" to the victim was "wiped away and d[idn]'t seem to count." She told the court and the victim's family that she was also a victim, but they did not hear her story "for reasons that were beyond [her] control." The Defendant also alleged that she suffered "years of physical, emotional, and psychic trauma, abuse, and injury" from the victim. Though "the details and circumstances of [her] victimizations at the hands of the deceased were not permitted," the Defendant was "deeply remorseful and more important[ly,] repentant." She apologized to her family, the victim's family, and her community for their pain.

The Defendant's presentence report was also admitted at the sentencing hearing. The Defendant did not have any previous criminal record and had completed vocational school and was employed prior to the divorce. She self-reported both her mental and physical health as "poor" and noted that she was previously diagnosed with "C-PTSD; anxiety; panic attacks; on occasion hears voices; depression." She further self-reported being prescribed "Zoloft; Alazapine; Adderall." The Defendant's "STRONG-R" assessment placed her in the "moderate" risk level for "Attitudes/Behaviors," specifically noting that her "motivation for criminal behaviors" included "reaction to conflict or stress[,]" "anger[,]" and "retaliation or vengeance[.]"

The trial court classified the Defendant as a Range I, standard offender. After considering the Defendant's presentence report, victim impact statements, and enhancement and mitigation factors, and other relevant information, the trial court imposed a total effective sentence of 25 years' incarceration in the Department of Correction, the maximum sentence. The trial court also ordered her to pay $25,000 in fines plus court costs and to have no contact with the victim's family. The Defendant filed a "Motion for New trial, Verdict of Acquittal, and/or Modification of Sentence" on September 23, 2020, alleging insufficient evidence, error in admitting the videos taken from the victim's cell phone and Exhibit 4D, and the misapplication of enhancement and mitigating factors. The trial court held a hearing on the motion on January 6, 2021, and denied the motion by written order on January 7, 2021. The Defendant filed a timely notice of appeal on January 26, 2021, and this case is now properly before this court for review.

## ANALYSIS

The Defendant contends on appeal that: 1) the trial court abused its discretion in admitting Exhibits 4B and 4C, two cell phone videos taken from the victim's phone depicting his shooting death; 2) the trial court abused its discretion in admitting Exhibit 4D, a "video compilation of other exhibits manipulated and edited by law enforcement"; 3) the trial court committed plain error by admitting Exhibit 4D in violation of the Defendant's due process rights; 4) the evidence was insufficient to sustain the Defendant's

- 14 -

conviction for second degree murder; and 5) the trial court erred in sentencing the Defendant to twenty-five years' imprisonment, specifically asserting that it misapplied enhancement factors and relied on acquitted conduct.

I. **Admission of the iPhone Videos, Exhibits 4B and 4C.** The Defendant first asserts that the trial court abused its discretion in admitting Exhibits 4B and 4C, the two videos taken from the victim's iPhone, because "of their gruesome nature and undue prejudice against" the Defendant. The State responds that the videos were relevant and more probative than prejudicial. It further responds that the videos conveyed information that could not be conveyed by the eyewitnesses, including "the actual demeanor of the [D]efendant preceding the murder, her sustained aggression towards [the victim] in spite of the efforts of [] Barnes to intervene, and the apparent withdrawal of [the victim] from the altercation and his manifested desire to stop fighting with the [D]efendant." We agree with the State.

"Generally, the admissibility of evidence rests within the trial court's sound discretion, and the appellate court does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010) (citing State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007)). "Before a photograph or video tape may be admitted as evidence, it must be relevant to an issue that the jury must decide; and the probative value of the photograph or video tape must outweigh any prejudicial effect that it may have upon the trier of fact." State v. Braden, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993) (citing State v. Aucoin, 756 S.W.2d 705, 710 (Tenn. Crim. App. 1988)). "The admissibility of videotapes of the crime scene and victims has long been within the sound discretion of the trial judge, and his or her ruling on admissibility will not be disturbed absent a clear showing of an abuse of that discretion." State v. Stacy Johnson, No. W2004-00464-CCA-R3-CD, 2005 WL 645165 (Tenn. Crim. App. Mar. 15, 2005) (citing State v. Ronnie Michael Cauthern, No. 02C01-9506-CC-00164, 1996 WL 937660, at *17 (Tenn. Crim. App. Dec. 2, 1996)); see also State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978); State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993). A trial court is found to have abused its discretion when it applies "an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" Lewis, 235 S.W.3d at 141 (quoting State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006)). "[T]he modern trend is to vest more discretion in the trial judge's rulings on admissibility." State v. Carruthers, 35 S.W.3d 516, 577 (Tenn. 2000).

Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Evidence which is not determined to be relevant is inadmissible. Tenn. R. Evid. 402. In addition, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by

- 15 -

the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Unfair prejudice has been defined as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" Banks, 564 S.W.2d at 951 (quoting Fed. R. Evid. 403, Advisory Comm. Notes). "Prejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" State v. Young, 196 S.W.3d 85, 106 (Tenn. 2006) (citations and internal quotation marks omitted).

After the Defendant objected to the admission of Exhibits 4B and 4C at trial based on Rule 403, the trial court admitted the videos, reasoning as follows:

> All right. Well, again, I've reviewed the -- both videos, the first video, which is the video/audio recording approximately 35 seconds and again, certainly, it does appear to be relevant to the charge in this case. So, I'm going to overrule the objection as to the first video.
>
> With respect to the second video and audio recording, again, I've reviewed that recording outside the presence of the jury. Again, I'm going to overrule the objection. I think it's certainly relevant in this case, even though, obviously, you know, something may be very prejudicial but that doesn't make it irrelevant and certainly, based upon the charge in this matter, I think it's very relevant. So, motion will be overruled.

We have reviewed Exhibit 4B and Exhibit 4C. Exhibit 4B consists of a 35-second video taken from the victim's iPhone. The Defendant is depicted wearing a black long-sleeve jacket and black pants. She kicks her leg and makes punching motions towards the camera. She shouts "Guess what? Here's your crazy! Here's your crazy!"[9] The Defendant points her finger towards the camera and angrily says, "You want to make people? Go ahead!" The victim is heard breathing heavily off-camera. The Defendant then walks back towards her black SUV, throws something towards the victim, and gets inside her vehicle, saying "Go ahead." She backs her SUV up slightly before driving it directly towards the victim. The victim, still off-camera, repositions himself behind his maroon sedan. The Defendant then backs her SUV partially out of the driveway before reemerging from the SUV and continuing to shout at the victim, saying something that sounds like "You think this life…" and wagging her finger.

---

[9] The record does not contain a transcript of Exhibit 4B or 4C. Accordingly, our recount of the video dialogue is not necessarily verbatim.

Exhibit 4C is six minutes and 54 seconds in length. Barnes is seen wearing a long white dress, talking to the Defendant, who is standing behind the open back-passenger door of her SUV. Only the Defendant's feet are visible at the beginning of the video. Barnes then walks towards the victim, hands a piece of paper to him, and says, "I don't want y'all fighting." The victim, off-camera, responds, "I don't want to be fighting either. I'm trying to protect my property." Barnes then walks back towards the Defendant, who steps out from behind the vehicle's door, waving one arm towards Barnes, with her other arm still hidden behind the vehicle's door. The Defendant says to Barnes, "You weren't there when I needed you to witness when he left! He lied! He lied when he left, and you weren't there to witness it!" Barnes responds, but her words cannot be heard on the recording. The Defendant then repeats to Barnes, "Get out of here! Get out of here! Please, get out of here!" She then points her finger towards the victim and tells Barnes, "Go talk to him!" The victim, still off-camera, then tells Barnes, "Ma'am, just leave. Ma'am, come to me." Barnes then turns towards the victim, and the Defendant quickly walks past Barnes towards the victim with both of her hands behind her back. As she approaches the victim, the Defendant raises a black handgun with both of her arms outstretched and repeats, "He wants this! He wants this!" She then fires five shots, and the victim and the camera fall to the grass. The Defendant then waves the handgun towards the victim and repeats while crying, "You wanted this! You wanted this!" Police are then heard arriving at the scene, while the video continues recording, showing blurry grass and eventually a black screen. The video continues until someone picks up the iPhone and ends the recording, partially showing the victim's body for approximately the last six seconds of the video as the person picks up the phone from the ground.

The Defendant asserts that the admission of Exhibits 4B and 4C was an abuse of discretion creating reversible error and cites State v. Jeffrey Wooten, No. E2018-01338-CCA-R3-CD, 2020 WL 211543, at *8 (Tenn. Crim. App. Jan. 13, 2020), and State v. Anita Kay Broughton, No. E2007-02533-CCA-R3-CD, 2009 WL 648933, at *12 (Tenn. Crim. App. Mar. 13, 2009), perm. app. denied (Tenn. Aug. 17, 2012), to support such an assertion. Specifically, the Defendant argues that Exhibits 4B and 4C "fail to go beyond the existing witness testimony presented at trial, yet provide graphic and gruesome footage of the offense as it happened." Despite the Defendant's arguments to the contrary, Wooten and Broughton are easily distinguishable from the instant case. In Wooten, this court concluded that the trial court erred in admitting a 911 recording where the probative value of the recording was "far outweighed by the danger of unfair prejudice and needless presentation of cumulative evidence." Jeffrey Wooten, 2020 WL 211543, at *8. The recording was almost 14 minutes in length and depicted the victim's mother and sister finding his deceased body in their home, and this court reasoned that the probative value of the call was significantly lessened by the mother's and sister's extensive testimony "regarding the circumstances of the carjacking and the condition of their home after the burglary and upon finding the victim's body[.]" Id. This court went on to conclude that admission of the

recording was harmless error given the "overwhelming" evidence of the defendant's guilt. Id. at *10. In Broughton, this court concluded that the trial court did not err in refusing to admit a video of the crime scene where the video did not provide any additional evidence and was "cumulative considering the numerous photographs of and extensive testimony about the crime scene." Anita Kay Broughton, 2009 WL 648933, at *12.

In the instant case, unlike in Wooten and Broughton, the recordings at issue provide additional evidence that was not otherwise presented through testimony or photographs. Although it was undisputed that the Defendant was the perpetrator of the shooting, whether the shooting amounted to first degree murder was a question for the jury. As such, the videos from the victim's iPhone were relevant to help the jury establish whether premeditation existed. Premeditation can be inferred from the circumstances surrounding the offense. Young, 196 S.W.3d at 108. Curlin was not close enough to the altercation to hear the dialogue between the Defendant and the victim, and Barnes was not present for the entire altercation; she testified that she arrived after the Defendant drove her SUV towards the victim and that she went to her vehicle after the Defendant first shot the victim. The Defendant's mental state surrounding the shooting was particularly relevant, given the Defendant's continuous assertion that she "blacked out" and did not remember the shooting or the events following. Accordingly, we conclude that Exhibits 4B and 4C were relevant and not unnecessarily cumulative.

The Defendant also contends that Exhibit 4B and Exhibit 4C should have been excluded because of their "gruesome nature[,]" specifically because the videos "showed how the victim was killed from his perspective and his wounds following the shooting." Initially, we have reviewed Exhibit 4C countless times, and we disagree that it shows the victim's wounds. At the 6:49 mark, the victim's hand is shown curled partially into a fist, set against a grassy backdrop. There is a single drop of blood shown on his thumb. At the 6:51 mark, the camera moves up slightly, showing the victim's elbow and forearm in addition to his hand, with a blurry streak of blood shown near his elbow. At 6:53, the camera zooms out, and the view expands to include the victim's shoulder, knee, hand, and elbow. The image is very blurry and lasts for approximately one second before the recording stops. The victim appears to be lying on his stomach, and the rest of his body is not visible. There is a blurry mark on the sleeve of his shirt, but it is unclear what the mark actually is and whether that mark was caused by a gunshot wound due to the extremely blurry quality of the image. There are otherwise no wounds shown and no blood present except the drop of blood on his thumb and two streaks of blood on his elbow. Considering that the victim suffered four fatal gunshot wounds, none of which are definitively depicted in the video, we disagree that the footage "showed the wounds sustained by [the victim]" as alleged in the Defendant's brief. The Defendant notes that in State v. Reid, 164 S.W.3d 286, 319 (Tenn. 2005), our supreme court held that the trial court did not err in admitting color photographs of multiple victims' stab wounds to the neck because the photographs

"were not unduly gruesome or unfairly prejudicial." The Reid court also concluded that the photographs were relevant and not introduced for the purpose of inflaming the jury. Id. The Defendant further cites to multiple instances of this court upholding the admission of photographs of victims' wounds in murder cases, seemingly to encourage this court to conclude that the video depiction of the victim's shooting and partial depiction of his body were unduly gruesome. See State v. Lesurgio Duran Wilson, No. M2017-01950-CCA-R3-CD, 2019 WL 246249, at *7-8 (Tenn. Crim. App. Jan. 17, 2019), perm. app. denied (Tenn. May 16, 2019) (concluding that close-up photographs of victim's five gunshot wounds were not so unduly gruesome as to be unfairly prejudicial); State v. Crystal L. Gregoire, No. M2017-01562-CCA-R3-CD, 2019 WL 931829, at *13 (Tenn. Crim. App. Feb. 25, 2019) (concluding that photographs of victim's wounds made by hammer, including photograph of neck wounds and "cleaned-up" photograph of "caved-in portion" of skull, were "unpleasant" but not unduly gruesome); State v. Michael Dewey Ellington, No. E2012-00908-CCA-R3-CD, 2013 WL 5718184, at *7 (Tenn. Crim. App. Aug. 13, 2013) (concluding that photograph of victim's bloody face depicting gunshot wound exiting through her chin was not unduly gruesome).

Despite the Defendant's assertions to the contrary, we cannot conclude that the trial court abused its discretion in admitting Exhibits 4B and 4C. Although certainly unpleasant, the videos are not unduly gruesome. We can find no support, and the Defendant offers none, of her assertion that depicting the shooting from the victim's point of view renders the videos unduly gruesome. Concluding that a victim filming his own murder is per se unduly gruesome because it conveys his point of view would create a dangerous precedent. As noted above, the videos show minor amounts of blood for only a few seconds and do not definitively depict any of the victim's gunshot wounds. This court has repeatedly concluded that far more graphic images were not unduly gruesome. See, e.g., Lesurgio Duran Wilson, 2019 WL 246249, at *7-8; Crystal L. Gregoire, 2019 WL 931829, at *13; Michael Dewey Ellington, 2013 WL 5718184, at *7. Further, there is no indication that the "primary purpose" of the videos was "to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" See State v. Collins, 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998) (quoting M. Graham, Handbook of Federal Evidence 182-83 (2d ed. 1986)). Accordingly, Exhibits 4B and 4C were relevant to the Defendant's demeanor and state of mind, not unnecessarily cumulative, and their probative value was not substantially outweighed by the danger of unfair prejudice. See Tenn. R. Evid. 403. The Defendant is not entitled to relief.

**II. Abuse of Discretion in Admitting Exhibit 4D.** The Defendant next contends that the trial court abused its discretion in admitting Exhibit 4D based on its "irrelevance, unfair prejudice, and cumulative nature." The Defendant asserts that Exhibit 4D was created "to explain how the State believed the shooting occurred" and "created their own version of events for the jury to view." The Defendant further asserts that Exhibit 4D

prejudiced her defense because "the exhibit was an effort from the State to substitute its interpretation of events as the jury's interpretation of events and to usurp the jury's role as finder of fact and determiners of witness credibility and conflicting evidence" and because there was no proof that Exhibit 4D "was a fair and accurate portrayal of events[.]" The Defendant argues that the "existence of" Exhibit 4D was not disclosed to her until the State "sought to admit it on the date of trial," foreclosing her ability to "counter this footage" or "make arguments against its authenticity, admission, or value." Finally, the Defendant contends that Exhibit 4D should have been excluded based on its cumulative nature. The State responds that Exhibit 4D "clearly and accurately reflects exactly what happened" and "connects the three exhibits in real time context to be more appropriately evaluated and considered by the jury." The State further responds that Exhibit 4D "was properly deemed relevant, and its probative value far exceeded any unfair prejudice."

We apply the same legal framework from section I, supra, to the admission of Exhibit 4D. At trial, the Defendant objected to Exhibit 4D based on its cumulative nature and the State's failure to disclose the existence of the exhibit to the defense prior to trial. In overruling the Defendant's objection, the trial court reasoned:

> Well, I'm going to overrule the [D]efendant's objection. I understand that this overlay was created to show the real time of the sequence of events. Everything that the [c]ourt has just observed on this overlay video has already been admitted into evidence and so, I'm going to overrule the [D]efendant's objection. I will allow that video with the 911 call that's overla[i]d to be played, again, or be offered into evidence, if that's what the [S]tate intends to do.

Exhibit 4D is nine minutes and 22 seconds in length and begins with a ringing tone and Curlin telling 911 he needs police, set to a black screen with "April 8th, 2019," written across it. The 911 audio from Exhibit 4A continues to play on top of the video from Exhibit 4B, with the audio from Exhibit 4B still audible. As the video from Exhibit 4B ends, a title card appears overlaid on top of a photograph of the crime scene demarcated by yellow crime scene tape, depicting the victim's maroon sedan, with his legs visible on the ground behind the sedan, and the front of the Defendant's SUV. The screen reads, "Curlin remains on 911. Janet Barnes arrives on scene off camera." The 911 call continues playing, and Curlin relays that Barnes has pulled up to the scene. The title card and the 911 audio play for approximately one minute and 12 seconds before the video from Exhibit 4C begins playing with the original audio and the 911 call both audible. At the end of the video from Exhibit 4C, another title card appears on a dark green screen that says, "STARRING [Enter your cast here]." A gray title card that says, "FILMED ON LOCATION [Enter location here]" then appears before being replaced by a third title card that reads, "SOUNDTRACK [Enter soundtrack info here]."

- 20 -

The Defendant asserts, and we agree, that the trial court should have excluded Exhibit 4D under Tennessee Rule of Evidence 403, which renders relevant evidence inadmissible where "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Although the jury obviously needed to determine whether the victim's murder was premeditated, Exhibits 4B and 4C were sufficient to demonstrate the Defendant's demeanor and state of mind prior to, during, and after the shooting. Adding Exhibit 4A's audio and title cards over Exhibits 4B and 4C videos "'added little or nothing to the sum total knowledge of the jury[.]'" Young, 196 S.W.3d at 106 (quoting State v. Dicks, 615 S.W.2d 126, 128 (Tenn. 1981)). We are unpersuaded by the State's assertion that Exhibit 4D "provide[d] perspective on the timeline of the three exhibits and how they correlate to each other." Further, given that Exhibits 4A, 4B, and 4C were already admitted into evidence, the probative value of Exhibit 4D was marginal at best. Under these circumstances, the probative value of Exhibit 4D was substantially outweighed by the needless presentation of cumulative evidence. Accordingly, we conclude that the trial court erred in admitting Exhibit 4D into evidence.

Although we conclude that the admission of Exhibit 4D was erroneous based on its cumulative nature under Rule 403, we disagree with the Defendant's assertion that it constitutes reversible error. We conclude the error was harmless given the overwhelming proof of the Defendant's guilt. See Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."); State v. Cannon, 254 S.W.3d 287, 298-99 (Tenn. 2008) ("We apply a harmless error analysis to 'virtually all evidentiary errors.'"). We reiterate that Exhibit 4D was comprised of Exhibits 4A, 4B, and 4C. While the admission of Exhibit 4A was not contested, we have already concluded that Exhibits 4B and 4C were properly admitted. "[T]he improper admission of evidence that is cumulative to evidence already admitted is harmless error." State v. Gregory Gill, No. W2018-00331-CCA-R3-CD, 2019 WL 549651, at *14 (Tenn. Crim. App. Feb. 11, 2019), perm. app. denied (Tenn. May 16, 2019) (citing State v. Elisa Cochran, No. 03C01-9708-CR-00353, 1998 WL 783343, at *7 (Tenn. Crim. App. Nov. 3, 1998), perm. app. denied (Tenn. May 10, 1999)); see also State v. Lawrence Taylor III, No. W2015-01693-CCA-R3-CD, 2016 WL 4576044, at *13 (Tenn. Crim. App. Aug. 31, 2016) ("because the statement was cumulative of proof already in the record, if the trial court had erred when allowing the statement to be read into evidence, the error would be harmless"). We also note that the Defendant was convicted of second degree murder, a lesser-included offense of first degree murder, the charged offense, after the jury reviewed all of the evidence, including Exhibit 4D. The trial court erred by

admitting Exhibit 4D because of its cumulative nature, but the error was harmless given the overwhelming evidence of the Defendant's guilt and in that it did not undermine the fundamental fairness of her trial. The Defendant is not entitled to relief

Although we have already concluded that the trial court erred in admitting Exhibit 4D based on its cumulative nature, we briefly address the Defendant's alternative grounds in favor of its exclusion.[10] With respect to the Defendant's argument for the exclusion of Exhibit 4D under Rule 403 based on the State's failure to disclose its existence until the day of trial, we note that Rule 403 does not specifically include "surprise" as grounds for exclusion. "This does not mean, however, that surprise could not constitute 'unfair prejudice' in an unusual case[.]" Neil P. Cohen et al., Tennessee Law of Evidence § 4.03[6][a] (6th ed. 2011). We cannot conclude here, though, that the admission of Exhibit 4D constituted unfair prejudice based on the State's failure to disclose its existence until the day of trial. Exhibit 4D was comprised of Exhibits 4A, 4B, and 4C, which the Defendant was apparently provided prior to trial.[11] With the exception of the two title slides, reading "April 8, 2019," and "Curlin remains on 911. Janet Barnes arrives on scene off camera[,]" Exhibit 4D was no different than Exhibits 4A, 4B, and 4C. The Defendant asserts that the admission of Exhibit 4D "foreclose[ed] the ability of [the Defendant] and her trial counsel to prepare to counter this footage or make arguments against" its admission while also asserting that it should have been excluded because it was cumulative of other evidence already admitted. We also note that the Defendant learned of Exhibit 4D during Investigator Groves' testimony on July 15, 2020, the first day of trial. Although admitted at that time, Exhibit 4D was not played for the jury until the State's rebuttal closing argument on July 16. Given that the Defendant possessed all of the separate parts of Exhibit 4D prior to trial and fails to establish what, if any, unfair prejudice was suffered, we cannot conclude that the trial court abused its discretion in admitting Exhibit 4D based on the State's failure to disclose its existence until trial.

The Defendant also relies on State v. Gaddis, 530 S.W.2d 64, 69 (Tenn. 1975) for the assertion that "failure to disclose the distinct exhibit [4D] runs afoul of longstanding practice of evidence disclosure in Tennessee." The Defendant elaborates that the State's failure to relay the existence of Exhibit 4D until trial renders it inadmissible by creating "immense" prejudice that far outweighs its probative value. Initially, we note that Gaddis

---

[10] The Defendant also asserts that Exhibit 4D should have been excluded under Rule 403 because the State "failed to show that the compiled footage was a complete and fair portrayal" of the shooting. However, given that the Defendant has not previously utilized this reasoning and given that such reasoning is parallel to the Defendant's plain error argument, we relegate addressing this assertion to the following section.

[11] We note that the record on appeal does not contain any discovery motions. However, at the motion for new trial hearing, trial counsel conceded that Exhibits 4A, 4B, and 4C were provided to the Defendant prior to trial.

addresses reciprocal discovery violations and procedures, not Rule 403. The Defendant did not object to Exhibit 4D on discovery grounds at trial, in her motion for new trial, or at the motion for new trial hearing. Instead, the exclusion of Exhibit 4D is argued under Rule 403 based on the "unfair prejudice" created by the Defendant not seeing the exhibit until trial. Thus, to the extent that the Defendant intends to raise a discovery violation, she has waived such an argument. See State v. Cyrus Randy Whitson, No. M2007-02197-CCA-R3-CD, 2009 WL 3787457, at *6 (Tenn. Crim. App. Nov. 12, 2009), perm. app. denied (Tenn. Apr. 23, 2010) (noting that Rule 16 discovery violation not included in motion for new trial was waived); see also Tenn. R. App. P. 3(e). Regardless, this court has concluded that a defendant was not prejudiced by undisclosed evidence where such evidence was cumulative and "not devastating[.]" State v. Joey Walton, No. W2013-00655-CCA-R3-CD, 2014 WL 683875, at *11 (Tenn. Crim. App. Feb. 19, 2014), perm. app. denied (Tenn. June 20, 2014); see also Ruffin v. State, 580 S.W.2d 799, 801 (Tenn. 1979) (stating that even if failure of State to disclose cumulative evidence was erroneous, such error would be harmless).

**III. Plain Error in Admitting Exhibit 4D.** The Defendant next argues that the trial court committed plain error in admitting Exhibit 4D by violating her due process rights through the State "knowingly creat[ing a] false impression of a material fact[.]" The State responds that the Defendant "fails to show that anything in Exhibit 4D was inaccurate, false[,] or misleading" or that action by this court is "necessary to do substantial justice." We agree with the State.

Under the plain error doctrine, "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). In order for this court to find plain error,

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "It is the accused's burden to persuade an appellate court that the trial court committed plain error." State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007) (citing Unites States v. Olano, 507 U.S. 725, 734 (1993)). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24

S.W.3d at 283. We evaluate the Defendant's claim of plain error with these principles in mind.

Initially, we note that the record clearly establishes what occurred in the trial court. The Defendant asserts that the State breached the "clear and unequivocal rule of law" espoused in Miller v. Pate, 386 U.S. 1, 7 (1967), namely that "the Fourteenth Amendment cannot tolerate state criminal convictions obtained by the knowing use of false evidence." In Miller, the United States Supreme Court held that the defendant's trial was constitutionally invalid where the prosecutor made "consistent and repeated misrepresentation" that a pair of shorts were "heavily stained with blood" while knowing that the stain was actually red-brown paint, such that the "prosecution deliberately misrepresented the truth." Id. at 6. The Defendant further notes that "due process is violated not only where the prosecution uses perjured testimony to support its case, but also where it uses evidence which it knows to create a false impression of a material fact." Hamric v. Bailey, 386 F.2d 390, 394 (4th Cir. 1967). In Hamric, the prosecution allowed two witnesses to testify that there were no "particles of glass and wood" found on the victim's body, which the court deemed a "crucial fact[,]" while failing to disclose a laboratory report and another witness' testimony that revealed otherwise. Id. at 395. The court reasoned that the prosecution's conduct was "analogous to Miller" in that the prosecution's "use of the challenged testimony gave a false impression as to facts integrally connected with the defendant's claim that she acted in self defense[,]" such that "the Fourteenth Amendment w[ould] not permit th[e] conviction to stand." Id. In her reply brief, the Defendant also cites United States v. Bartko, 728 F.3d 327, 335 (4th Cir. 2013), to support her contention that her due process rights were violated by the admission of Exhibit 4D. In Bartko, the court concluded that the trial court properly denied the defendant a new trial where a witness falsely testified that the government did not offer him anything in exchange for his testimony, and the State did not correct him, where the witness was already impeached by defense counsel.

Though the Defendant encourages us to analogize the admission of Exhibit 4D to Hamric and Miller, where the prosecution presented patently false facts to be considered as evidence and did not correct misleading information, the instant case is easily distinguishable. Unlike Hamric and Miller, the prosecution in the instant case did not present false evidence or create a false impression of what occurred surrounding the shooting. While Exhibit 4D was unnecessarily cumulative as discussed above, there is nothing to suggest that any part of it was false or misleading. In fact, the Defendant does not assert which part of Exhibit 4D was false or misleading. Instead, she argues, without support, that the State "created a false impression of a material fact through the admission of a video compilation crafted by law enforcement to present the jury with the State's interpretation of events as substantive evidence." She does not describe which part of Exhibit 4D constitutes the State's interpretation. The Defendant elaborates that the lack of

a "guarantee of authenticity beyond Investigator Groves' claim that he used the 911 call audio as a 'baseline[,]'" renders Exhibit 4D "no more than the State's interpretation of events misleadingly presented as the unvarnished version of truth." We are unable to see, and the Defendant fails to show, how Exhibit 4D was false or misleading. We reiterate that it consisted of Exhibits 4A, 4B, and 4C, which we have already concluded were properly admitted. We have reviewed Exhibits 4A, 4B, 4C, and 4D multiple times, and Exhibits 4A, 4B, and 4C were compiled in their entirety into Exhibit 4D. Though a few title cards were added, none of which presented any contested fact or additional information, the videos and audio were firsthand, real-time depictions of the shooting. Exhibit 4D was also consistent with the testimony given by Curlin and Barnes. The Defendant has failed to show how her due process rights were violated. As such, we cannot conclude that a clear and unequivocal rule of law was breached.

The Defendant also asserts that Exhibit 4D should have been excluded under Rule 403 because the State "failed to show that the compiled footage was a complete and fair portrayal" of the shooting. We note that the Defendant did not employ such reasoning, based on Rule 403 or otherwise, at trial or in her motion for new trial. Although raised under the Rule 403 section of her brief, we address this assertion here due to its adjacency to her plain error argument. The Defendant relies on State v. Farner, 66 S.W.3d 188, 209 (Tenn. 2001), to support the contention that the State's failure to show Exhibit 4D was fair and accurate rendered it inadmissible under Rule 403. However, the Farner court analyzed a computer animation of a car accident and found that its probative value was substantially outweighed by the danger of unfair prejudice because it was "inconsistent with the proof" presented at trial and was not a "fair and accurate portrayal of the event depicted[.]" Id. at 209, 210. Here, the Defendant makes conclusory arguments without support that Exhibit 4D was unfair and inaccurate. The Defendant does not offer proof or argument of how Exhibit 4D was unfair, inaccurate, or analogous to Farner. We reiterate that Exhibit 4D was consistent with the testimony given at trial. In fact, in discussing Exhibits 4B and 4C in her appellate brief, which make up Exhibit 4D, the Defendant stated that "[t]he footage generally aligned with the narrative that was already developed through witness testimony and provided in the 911 recording[.]" As mentioned above, Investigator Groves added title slides in Exhibit 4D that were not present in the other exhibits, but the slides stated only the date of the offense, that Curlin continued speaking to the 911 operator, and that Barnes arrived at the altercation. The other title cards at the end of Exhibit 4D were obviously preprogrammed slides that were inadvertently included. Alhough we have already concluded that Exhibit 4D was erroneously admitted at trial, though harmlessly so, we cannot conclude that its probative value was outweighed by the danger of unfair prejudice due to its alleged inaccuracy and therefore cannot conclude that a clear and unequivocal rule of law was breached with respect to the alleged inaccuracy. Because the Defendant has failed to establish a breach of a clear and unequivocal rule of law, she is not entitled to relief under the plain error doctrine.

**IV. Sufficiency of the Evidence.** The Defendant next contends that the evidence is insufficient to support her conviction for second degree murder because "the proof did not establish that [the Defendant] knowingly killed [the victim] or did so without adequate provocation." The Defendant elaborates that the "circumstances of the offense, mere days after the completion of a years-long divorce," caused the Defendant to become "enflamed to a mental state where she did not have reasonable certainty of the effects of her actions." The States responds that the evidence was more than sufficient to sustain the second degree murder conviction and that a reasonable juror could "find that the [D]efendant knowingly shot [the victim] five times with an awareness that such conduct was reasonably certain to cause his death." We agree with the State.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v.

Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

As relevant to the instant case, second degree murder is defined as "[a] knowing killing of another," Tenn. Code Ann. § 39-13-210(a)(1), and is a result-of-conduct offense, State v. Davis, 466 S.W.3d 49, 69 (Tenn. 2015). A person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). "[T]he proof to support the mens rea element of second degree murder needs to demonstrate beyond a reasonable doubt only that the accused 'knew that his or her actions were reasonably certain to cause the victim's death.'" State v. Parker, 350 S.W.3d 883, 904 (Tenn. 2011) (quoting State v. Brown, 311 S.W.3d 422, 432 (Tenn. 2010)). Whether a defendant acts knowingly in killing another is a question of fact for the jury. Brown, 311 S.W.3d at 432; State v. Inlow, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000). A jury may infer that a defendant acted knowingly from the surrounding facts and circumstances. Brown, 311 S.W.3d at 432; see Inlow, 52 S.W.3d at 105 ("Intent . . . may be deduced or inferred by the trier of fact from the character of the assault, the nature of the act and from all the circumstances of the case in evidence.").

Viewed in the light most favorable to the State, the evidence shows that on the day of the shooting, the Defendant learned that the victim was at the big Hollywood Drive house. She then asked Barnes if she could park her SUV in her driveway and went to Phillips' house. After Phillips left to pick up her children from school, the Defendant went to the little Hollywood Drive house and confronted the victim after witnessing him remove her mail from the mailbox. He denied having her mail, and she grabbed hold of the strap of a messenger bag he was holding. He also grabbed hold of the strap, and an altercation ensued. Curlin heard the altercation and called 911. At some point, the victim placed the Defendant in a headlock, which ended when she let go of the bag. The Defendant got into her SUV and drove it towards the victim. Barnes arrived and attempted to intervene, and she testified that the victim did not appear angry or like he wanted to fight with the Defendant. The Defendant returned to her SUV and retrieved a nine-millimeter firearm from it, which she held behind her SUV's door and then behind her back as she approached Barnes and the victim. She repeatedly urged Barnes to "get out of [t]here" before going past Barnes to shoot the victim five times. The weapon she used required her to pull the trigger each time in order for it to shoot.

The Defendant maintains that there "was no proof that [she] was aware of her actions as she committed them or knew that she could have taken actions that would lessen the risk of fatality." The undisputed testimony of Barnes and the videos taken from the victim's iPhone showed that the Defendant deliberately fired five shots at the victim. This court has consistently stated that the "deliberate firing of shots at a person constitutes 'knowing' conduct for the purpose of establishing second degree murder." State v. Dontavious Hendrix, No. W2015-01671-CCA-R3-CD, 2016 WL 3922939, at *5 (Tenn.

Crim. App. July 15, 2016), perm. app. denied (Tenn. Nov. 22, 2016) (citing State v. Tommy Dale Adams, No. M2013-01080-CCA-R3-CD, 2014 WL 3565987, at *20 (Tenn. Crim. App. July 21, 2014), perm. app. denied (Tenn. Dec. 17, 2014); State v. Montez Davis, No. E2011-02055-CCA-R3-CD, 2012 WL 6213520, at *11 (Tenn. Crim. App. Dec. 13, 2012), perm. app. denied (Tenn. Apr. 10, 2013); State v. Chancy Jones, No. W2010-02424-CCA-R3-CD, 2012 WL 1143583, at *10 (Tenn. Crim. App. Apr. 5, 2012), perm. app denied (Tenn. Aug. 16, 2012); State v. Antonio Sellers, No. W2011-00971-CCA-R3-CD, 2012 WL 1067213, at *7 (Tenn. Crim. App. Mar. 27, 2012); State v. Rickie Reed, No. W2001-02076-CCA-R3-CD, 2002 WL 31443196, at *6 (Tenn. Crim. App. Oct. 31, 2002), perm. app. denied (Tenn. Mar. 17, 2003)); see also State v. Randy Ray Ramsey, No. E2013-01951-CCA-R3- CD, 2014 WL 5481327, at *6-7 (Tenn. Crim. App. Oct. 29, 2014), perm. app. denied (Tenn. Jan. 16, 2015) (finding evidence sufficient to support second degree murder conviction where proof showed victim was lying on her back when defendant pointed a shotgun at her and fired). We further note that despite the Defendant's arguments that her state of mind was such that "she had no certainty of the outcome of any of her actions[,]" she was aware enough of her actions to conceal the firearm behind her SUV door and then behind her back and to warn Barnes to leave the area multiple times before shooting and killing the victim. The jury chose not to accredit the Defendant's assertion that she "blacked out" and did not remember the shooting, as was its prerogative as the trier of fact. Based on the proof, a rational jury could have found the Defendant guilty of second degree murder beyond a reasonable doubt. The Defendant is not entitled to relief.

**V. Errors in Sentencing.** The Defendant finally contends on appeal that the trial court abused its discretion in imposing the maximum 25-year sentence "after basing the sentence on acquitted conduct, misapplying several sentencing factors, and not applying the purposes and principles of sentencing." The State responds that the trial court "followed the proper sentencing procedures before sentencing the [D]efendant to a within-range sentence." In her reply brief, the Defendant elaborates that the trial court was erroneous in its consideration of premeditation as an enhancement factor because the State did not prove premeditation by a preponderance of the evidence. We agree with the State.

We review the length and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). Moreover, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Id. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." Id.

Upon imposing a sentence, a trial court must consider the following: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in § 40-35-113 and § 40-35-114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant wishes to make on the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b)(1)-(7). The defendant has the burden of showing the impropriety of the sentence on appeal. Id. § 40-35-401(d), Sentencing Comm'n Cmts. In determining the proper sentence, the trial court must consider the defendant's potential for rehabilitation or treatment. Id. §§ 40-35-102(3)(C) and 40-35-103(5). In addition, the court must impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. § 40-35-103(2), (4).

Initially, we note it is undisputed that the Defendant was subject to a sentencing range of fifteen to twenty-five years as a Range I, standard offender. See Tenn. Code Ann. § 40-35-112(a)(1). During the sentencing hearing, the trial court applied enhancement factor (5), that the defendant treated the victim with exceptional cruelty during the commission of the offense; enhancement factor (9), that the defendant possessed or employed a firearm, explosive device, or other deadly weapon during the commission of the offense; and enhancement factor (10), that the defendant had no hesitation about committing a crime when the risk to human life was high. See Tenn. Code Ann. § 40-35-114(5), (9), (10). The trial court applied "great weight" to all of the enhancement factors it found applicable. The trial court also applied "slight weight" to mitigating factor (13), which includes "[a]ny other factor consistent with the purposes of this chapter[,]" specifically referencing the Defendant's age, employment history, education level, and lack of criminal history. See Tenn. Code Ann. § 40-35-113(13). On appeal, the Defendant does not contest the trial court's application of enhancement factor (9), that the defendant possessed or employed a firearm, explosive device, or other deadly weapon during the commission of the offense.

The Defendant first asserts that the trial court erred in its application of enhancement factor (5), that the defendant treated the victim with exceptional cruelty during the commission of the offense. The Defendant elaborates that the trial court relied on "acquitted conduct without proper findings" in applying enhancement factor (5). Evidence supporting the application of the exceptional cruelty enhancement factor requires a finding of cruelty "over and above" what is required for the offense itself. State v. Arnett, 49 S.W.3d 250, 258 (Tenn. 2001) (quoting State v. Embry, 915 S.W.2d 451, 456 (Tenn. Crim. App. 1995)). Enhancement factor (5) is most often found in cases of abuse or torture, but

- 29 -

it has been found applicable in cases where traumatic and severe injuries were sustained by the victim. State v. Gray, 960 S.W.2d 598, 611 (Tenn. Crim. App. 1997). When applying this factor, a trial court should articulate the actions of the defendant, apart from the elements of the offense, which constitute exceptional cruelty. State v. Goodwin, 909 S.W.2d 35, 45-46 (Tenn. Crim. App. 1995).

In applying enhancement factor (5), the trial court reasoned that the Defendant "had to make the decision to pull that trigger five times" and noted that of the five gunshot wounds, the victim was shot twice in the back, "indicat[ing] at some point, he had his back turned to her when she was actually firing shots[,]" four of which were fatal. [IV, 72]. This court has previously found enhancement factor (5) applicable where the victim suffered multiple fatal gunshot wounds. See, e.g., State v. Kristopher Michael Martin, No. M2020-01384-CCA-R3-CD, 2022 WL 1817293, at *8 (Tenn. Crim. App. Dec. 15, 2021) (finding enhancement factor (5) applicable in second degree murder case where defendant shot victim twice in head such that it was indistinguishable which shot was fatal); see also State v. Ruben Walton, No. W2019-01762-CCA-R3-CD, 2020 WL 4919875, at *12 (Tenn. Crim. App. Aug. 20, 2020) (upholding application of enhancement factor (5) in second degree murder case where victim suffered "numerous fatal shots[,]" including to his back and chest from close range); State v. Jeffrey Lee Potts, No. M2020-01623-CCA-R3-CD, 2022 WL 2348233, at *29 (Tenn. Crim. App. June 29, 2022) (upholding application of enhancement factor (5) in attempted second degree murder case where victim was shot five times and suffered extensive injuries). Despite the Defendant's arguments to the contrary, the transcript from the sentencing hearing does not indicate, in our view, that the trial court relied on evidence of premeditation in applying enhancement factor (5). Though the trial court mentioned that the Defendant's "motive at some point was to kill him," as referenced by the Defendant, and stated that "in [its] opinion there was an intent to kill and that it was really more premeditated[,]" the record does not indicate that the trial court actually based the application of enhancement factor (5) on that reasoning, and we therefore decline to undertake an analysis as to whether premeditation was proven by a preponderance of the evidence at trial as requested by the Defendant. See State v. Winfield, 23 S.W.3d 279, 283 (Tenn. 2000) ("Accordingly, we hold that a sentencing court may apply an enhancement factor based on facts underlying an offense for which the defendant has been acquitted, so long as the facts have been established in the record by a preponderance of the evidence). Rather, as reasoned above, the trial court applied the factor based on the multiple fatal gunshot wounds that the victim suffered, including two fatal gunshot wounds to his back. The trial court did not mention premeditation until after it had individually assessed whether each enhancement factor applied. We do not equate the trial court's opinion that the Defendant could have been convicted of premeditated first degree murder to basing an enhancement factor on premeditation. Accordingly, based on the trial court's reasoning that the victim suffered four fatal gunshot wounds, including two to the back, and this court's conclusion in multiple occurrences that such was sufficient to establish

enhancement factor (5) in second degree murder cases, we conclude that the trial court did not err in applying enhancement factor (5). We also note that even if the trial court did erroneously rely on acquitted conduct, the Defendant's within-range sentence would still stand because there was at least one other appropriate enhancement factor applied, namely enhancement factor (9), as explained by the Winfield court. See Winfield, 23 S.W.3d at 284 (concluding that sentence did not need to be reduced despite trial court's erroneous reliance on acquitted conduct in applying an enhancement factor where the trial court otherwise correctly applied two enhancement factors).

The Defendant also argues that the trial court erred in its application of enhancement factor (10), that the defendant had no hesitation about committing a crime when the risk to human life was high. Enhancement factor (10) is inherent in every homicide in relation to the named victim; however, "the trial court may consider this factor when the defendant endangers the lives of people other than the victim." State v. Kelley, 34 S.W.3d 471, 480 (Tenn. Crim. App. 2000). Here, although Barnes was present during the shooting, nothing in the record suggests that she was endangered by the Defendant. Barnes gave no indication that she was at risk of being struck by bullets fired by the Defendant. In fact, Exhibit 4C shows the Defendant push past Barnes before shooting the victim, such that Barnes was completely behind her when she began firing at the victim. This court has concluded that "[m]ere speculation that a bullet may have gone astray and struck" a bystander who was standing behind a defendant when he fired a gun towards the victim was not sufficient to justify the application of enhancement factor (10). See State v. Baldwin, No. 01C01-9612-CR-00530, 1998 WL 426199, at *7-8 (Tenn. Crim. App. July 29, 1998), perm. app. denied (Tenn. Feb. 16, 1999). Accordingly, we conclude that the trial court erroneously applied enhancement factor (10).

The Defendant also seems to assert that the trial court erred in finding mitigating factor (2), that the defendant acted under strong provocation, inapplicable based on acquitted conduct. See Tenn. Code Ann. § 40-35-113(2). However, once again, the sentencing hearing transcript belies this assertion. In declining to apply mitigating factor (2), the trial court stated, "[T]here's nothing to indicate to me that [the Defendant] was in any way provoked into committing this act toward her ex-husband." The trial court's statement that the Defendant was "fortunate that the jury didn't find her guilty of first-degree premeditated murder because the evidence was more than sufficient to support that verdict" occurred after the trial court went through each factor and conducted an independent assessment of each factor. Further, the record supports the trial court's conclusion that mitigating factor (2) was inapplicable. The testimony presented at trial and the videos from the victim's iPhone show that the Defendant had to retrieve the firearm from her vehicle, conceal the firearm behind the SUV's door and her back, and warn Barnes to leave, all after the altercation had apparently ended. Thus, to the extent that the

Defendant argues that the trial court erroneously refused to apply mitigating factor (2), we disagree.

Despite the erroneous application of enhancement factor (10), we reiterate the trial court applied enhancement factor (9), which was not in dispute, and enhancement factor (5), which we have already concluded was correctly considered. This court has stated that even "[t]he application of a single enhancement factor can justify an enhanced sentence." State v. John M. Banks, No. M2019-00017-CCA-R3-CD, 2020 WL 5015888, at *10 (Tenn. Crim. App. Aug. 25, 2020), perm. app. denied (Tenn. Dec. 2, 2020). Further, the record reflects that the trial court considered the presentence report, the enhancement and mitigating factors, the principles of sentencing, the Defendant's statement of allocution, and the relevant sentencing factors before imposing the within-range sentence of twenty-five years for second degree murder, a Class A felony, while classifying the Defendant as a Range I, standard offender. See Tenn. Code Ann. §§ 39-13-210(a)(1), 40-35-112(a)(1), 40-35-210; see also Bise, 380 S.W.3d at 708. The Defendant is not entitled to relief.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
CAMILLE R. MCMULLEN, JUDGE